The next matter is F.L. individually on behalf of his son R.C.L. v. Board of Education of the Great Neck Union Free School District. Thank you. May it please the court. My name is Gary Mayerson. This is my colleague, Susan Wagner. We represent the father and his son. Time and again, this court and the Supreme Court have held that the IEP is the centerpiece of the school district's FAPE obligation. It is the main event. It's the foundation upon which everything else rests. Here, the side-by-side chart appearing in the appendix at pages 355 to 363 shows that the goals and objectives of R.C.L.'s IEPs were largely repeated, unchanged, year after year for three consecutive school years. A period when defendant claims that the student R.C.L. was making good progress across the board, but where standardized testing and other evidence would show otherwise. R.C.L. could not reliably read. He could not make change. And he certainly could not get through the glass menagerie as it was claimed by the school district. Here, there were IHO credibility determined . . . Yes, Judge Newman. The question was, could he read three sentences and get the words right? In other words, he wasn't asked to read the whole play and interpret it. No, no, he wasn't, but there was testimony before he even started. Whether it's right or not, I just want to be clear what he was asked to do. Read three sentences. He could read words. He could read some words, and he could not read other words. And that's what the glass menagerie episode was about. Could he read those three sentences? I think it was more than that, because the hearing officer caught the person who was testifying and who claimed there was glass menagerie was at issue. He said, has he even started the glass menagerie? No, and the answer was no, he hadn't even started it. But the testimony made it sound like he had already gotten through the glass menagerie. I thought it said, could he get through the three sentences. Well, anyhow. Okay. May I proceed? Sure. Thank you, Judge. So there were credibility assessments by the IHO that should have been deferred to. While RCL did, in fact, languish and regress, this court does not have to pinpoint the progress issue to decide RCL's appeal in RCL's favor. In Peay v. West Hartford, this court held that its prior decisions were consistent with the Supreme Court's 2017 decision in Andrew F. Applying Andrew F. Counsel, as I read your opening brief, your argument was essentially that the Supreme Court's decision in Andrew changed Second Circuit authority. And therefore, while we might be required to affirm based on Second Circuit precedent, now that Andrew was on the books, we had to provide a different level of scrutiny, and therefore, reversal was appropriate. Now, obviously, you're no longer taking that position. But do I understand your opening argument correctly? Our position is that it did effectuate a change insofar as goals and objectives are now required to be ambitious and sufficiently challenging. But I also think that it's not inconsistent with West Hartford's declaration that this court's decisions are consistent, certainly largely consistent with Andrew F. We have no problem with that case whatsoever. So even if this panel were to conclude that RCL was making some progress, all the more reason for a defendant to change its IEP goals from year to year to up the ante and make them ambitious and challenging, as Andrew F. would require. The district court, while acknowledging the existence of Andrew F., did not even address the challenging and ambitious nature. Yes, Judge Newman. Let me make sure I just understood what you said. You said even if he's making progress, they should increase the rigor of the goals? I said even if this court were to find that he made some selective progress, all the more reason why you should up the ante and make the goals more challenging and more ambitious. Why is that? Because how can goals that stay the same for three years ever be ambitious and challenging? Well, if the goals, not the ancillary services. Correct. Correct. When you go to the Andrew F. decision. I see. I'm focusing on the part of the decision that says that after this being the centerpiece, which of course every court says that it's the centerpiece. So the Andrew F. court says the goals may differ, but every child, every child should have the chance to meet challenging objectives. We're talking about IEP objectives, Judge. That's what we're talking about. And here, RCL's objectives in the IEP were largely repeated year after year for three years. Three years. And how are those defined? Are those measurable test results or what are those? Well, it's funny you should ask, Judge, because if you look at what the SRO said, the SRO said, quote, this is on page 107 of the appendix, Judge. This is very important. Quote, the hearing record does not offer information explaining the repetition of the annual goals. That's the evaluative criteria upon which the IEP team should have been making some decision. If there's going to be a decision to repeat the goals and objectives year after year, there should be some evaluative criteria or rationale for it. And here, the SRO says, we don't have any such evaluation. But that's a problem, and it's a problem for the school district, not for the appellant. The lack of any evaluative analysis in the record impacts upon the due deference doctrine, because the SRO should have been making his decision upon a complete and thorough record. He goes, the hearing record doesn't offer information. Well, that's a problem. Under section 4404 of the education law, the burden is on the school district to prove prong one, that it offered a FAPE. It's not on the parent or the student to prove that. The district court should have found that there was a failure of proof on the part of the school district to prove prong one. The SRO was at a loss. That loss should have fallen on the school district, not on the parent or the student. So where there's goals and objectives, RCL's IEPs were largely repeated, unchanged, year after year, and where the SRO himself noted that there's no rationale or explanation for this conduct in the record. None. We urge that the school district failed to meet its prong one evidentiary burden, and the district court should have so held. Now, of course, NJROF came down after the SRO ruled, but before Judge Forestine ruled. Judge Forestine did not address the challenging issue. She didn't address the ambitious issue. She didn't really grapple or wrestle with this problem, and it's a serious one. Because if every child is entitled to have the chance to meet challenging objectives, as NJROF says, and that's not inconsistent with this court's prior decision making, how else can the IEP be reasonably calculated? That is a fundamental requirement from the beginning of this court's decisions in IDEA. The requirement of a reasonably calculated IEP. Is a school district entitled to say or to think that even if the goals are the same, the progress year to year is sufficient to show that the plan complies with the act? I think the answer is no, because you don't just say, well, we must be doing something right because the student's progressing. Why not? Because the Supreme Court requires more. The Supreme Court says if the student is progressing, we want to see challenging and ambitious goals. We don't want to see them staying the same, and that was the situation . . . Your premise was progressing, not stay the same, progressing. Right. If the student is progressing . . . He could have progressed even more. Is that the idea? Not that he could even have progressed even more, but the NJROF case is talking about sufficiently challenging and ambitious. How could a goal that stays the same for three years . . . You're saying the goal . . . the new goals must be specified even if there is year to year progress by the student. Even if there's progress, it doesn't do away and obviate the need to have a challenging and ambitious goal. That's exactly what Congress wants. That's what the Supreme Court wants. They want these kids moving forward. They don't want them to be stagnating and saying, well, that's enough progress for you. Because, if you look at the first thing that the NJROF court said, was that FAPE is markedly more demanding than the merely more than de minimis test. So, we've lifted, not here in the Second Circuit, but in other circuits that had the merely more than de minimis test. That standard has been lifted across the nation. Counsel, your time has expired. You've reserved two minutes for rebuttal. Yes, Judge. We'll hear from the school district. Good morning. Good morning. May it please the court. My name is Laura Ferragiari. I'm counsel for Great Neck UDU Preschool District, defends and appends it in the instant matter. Just to address one or two comments from the appellant's opening remarks before I get into my statement. I couldn't find the exact citation that appellant made with regard to the SRO's decision. But what I did find, just looking at the decision on- Goals? No, yeah, about the lack of evaluative material that the goals allegedly were based on. No, he said there was a repetition of goals. They didn't change the goals. That is untrue, but he also said earlier- Well, it's at 107. It's the first full paragraph. I have my SRO decision here is appendix 1425. That's what I'm looking at, that page. Because the SRO decision, I think, was in the record on a couple of occasions because it was attached to different documents. Take a look at 107. I think that's the sentence he's talking about. Yeah, I don't have that in front of me. I'm sorry. Oh. But what I do see in front of me- Maybe he can show you his copy. Thank you. I think that's the sentence, first full paragraph. Right, and that was, what I believe, that was in reference to IEPs back during the 12-13 school year. The IEPs at issue here are the 13-14 school year and 14-15 school year. It does say over the two school years. Right, that was the early- It doesn't say over the three. Right, and then I'm looking later on in the SRO's decision, and the SRO specifically states that the evaluative information available to the June 2014 CSE and the present level contained, you know, it went through all the information that was in the record at the CSE meeting by which the CSE drafted goals and drafted the IEP. Well, were the goals increased? Yes, they were. Okay, and that's what I'd like to address. Each year or only the third year? Yes, they were. They were, and during- Which? I asked you which. Each year. I'm sorry. Each year. And there were even instances, so for example, during one school year, the CSE met in the fall, and then the CSE met again in April, and then the CSE met again in June twice during that same school year, and at each CSE, to the extent that the CSE members felt it was appropriate, the goals, the mastery was increased, and any other information in the goals were increased based on the child's needs at the time. If you look at the record, we submitted to the district court in response to plaintiff's goal chart, our own goal chart, and we noted, it's in the record, that plaintiffs omitted more than 20 goals from the goals that this child had over the school year, so we submit that plaintiff's chart that was submitted to the eastern district is not complete, and it's not an accurate representation. Our own chart is in the record for the court's reference. Where is that? Okay, so our chart is- That's the attention of the district court? Yes. And you mentioned this in your brief on appeal here before our court, and it was not responded to in the reply brief, correctly? I'm sorry, I missed that. In your brief on appeal, you referred to the fact that the appellant's brief chart was incomplete. Correct. And you directed our attention to the complete chart. Correct. And pointed out that actually the appellant's brief had made a number of legal and factual errors in its presentation. Correct. And none of that was responded to in the appellant's reply brief. Correct. So our goal chart is, on the record, it's pages A265 to 281. I won't repeat what was in my brief, but it's our position that that goal chart was not an accurate representation, so the whole argument about the insufficiency of goals is based on a false premise. Counsel? Yes, Your Honor. Can I turn to a matter of substance? Sure. One of the reports, I believe it was the SRO, but if I'm wrong, you'll correct me, reports that RCL was reading at a third grade level, though in ninth grade, and yet making solidly passing marks in English. Could you explain to me how that could happen? Sure. Because the child is deficient. He's a special education student. For that reason, he was referred to the Committee on Special Education and has an IEP since he was in preschool, and that's all in the record. One of the child's main issues is his reading, his fluency, his reading comprehension. So his reading level throughout his education was considerably low. He was placed in special education classes that address, that teach the content at a modified, broken-down basis, so children with low reading levels could succeed and could find progress, could make progress over the years. I can't explain why his... I'm not sure that it was third grade and tenth grade. I mean, I can look, but... In the ninth grade, he was reading at a third grade level. Okay. But remember, again, that's why the child has an IEP, because his levels are so low. I agree. I'm not doubting that he needs an IEP. I think what we're sort of wondering is how does the school, wholly apart from IEPs, how does the school say, he's finished the ninth grade, he's going on to the tenth grade, where presumably he'll have to read things even more difficult than in ninth grade. The child was in modified classes, so the child was not in a so-called mainstream curriculum. The curriculum was reduced based on the child's abilities and the child's abilities to read and understand. So what we did was we really created a program that targeted his deficits. He received specialized reading instruction over the years taught by a special education teacher that was daily in resource room. The reading program was targeted to all of his needs in the five areas of reading, and that was actually one of the things... So is that what, not necessarily just your school, is that what school districts, I mean, I'm looking for a little education. Yes, yes, yes. Is that what they do with these children who are challenged? Do they move them along year by year, graduate them, so that by age 18 or perhaps even 19, they're out of school, but they do their best to give them an IEP at each grade? Is that the idea? The child gets an IEP at each grade, correct. They never hold them back and say, I'm just not ready for tenth grade. Yeah, this child did not graduate in the typical years that it would take. So he graduated at, I think, age 19 rather than 18. And each year, you know, some of the classes are sort of ungraded, if you will, meaning the last two years he was in a different program, which was a pass or fail type of program. But he went through the Great Neck school system. He had, you know, he received sufficient amount of credits to graduate. I mean, there was no, you know, and again, that's a little past, you know, where we were in the record. He gets a diploma from the Great Neck High School that says you are a graduate of the Great Neck High School. Correct. He did not finish the 12th grade curriculum, even though the reading deficiency may be 3, 4, or 5th grade level. It wasn't at that level when he graduated. What was it? Yes. What was it? Well, in the record, the last we have in the record, I can grab this. He, you know, again, he was reading by June 2014, he was reading up to 237 words a minute. And he was at 6th grade instructional level, 7th grade frustration level, 5th grade independent levels. So that was. So 5th, 6th, 7th. Yeah, there's different levels. To give the world a diploma that says he's finished the 12th grade. Doesn't that seem a little odd? I'm not now pressing you about whether it complies with the statute, but just. I don't. Is that the way to run a school? I don't want to say too much because I don't want to be accused of saying things that are outside of the record, if you will, if that's okay. I would certainly answer your questions, but I don't want to. Well, do the best you can. Okay. So my understanding is that the child was able to complete the coursework. But again, it's not a, when you think of the child going to Great Neck in these AP classes or IB classes, this is not that child. This child has significant deficits. And he was in special education classes his entire, he was in a 1511 class the last year that the IEP was at issue. And that class, under state regulations, is for kids who need specialized instruction. And that's what he received, specialized instruction. 1511. It was a 1511 when it was recommended, and then in September, they added an aid to the class. It was a 1511, so that would be 15 students, one teacher, and one aid. And he also received individualized services throughout the school day. Let me ask you about the third year, the 14 to 15. Correct. The psychologist, if I have the right title, Mr. Horacio, or Ratio, how do you- That was the parent's private neuropsychologist who performed an evaluation, Horacio. Horacio, Ms. Horacio. She said for that year there was regression, correct? And did the state hearing officer reckon with that? No, both the state hearing officer and the Eastern District, they didn't make explicit credibility findings against Dr. Horacio, but they dismissed Dr. Horacio's findings, and they said that in cases under the IDEA, the fact that a privately retained expert says, or speaks differently, or makes a recommendation different from the school district's experts and the teachers is not determinative of the child's progress. Whether determinative or not, does it have to be reckoned with? It was reckoned with, and Dr. Horacio was present via teleconference at an April 2014 CSE. And I also believe that she participated at the first CSE meeting in June of 2014, June 5th. Participated, but did the hearing officer say, or at least give a conclusion as to whether her view was not sufficient to warrant any change? The hearing officer, meaning the state review officer? The state review officer. The state review officer, yes, did not. Both the state review officer and Judge Fierstein did not find that Dr. Horacio's recommendations and beliefs were as credible as the- Is that right? Were as, and that's why I used the word determinative, the SRO and the Eastern District Court took into account the testimony. And the testimony from the teachers and the evaluators from the school district at the hearing over that of Dr. Horacio. Over her report and her testimony. If we were to think that that's not exactly what happened, would the remedy be the remedy the plaintiff seeks? Or would the remedy be a remand to reckon more precisely with Dr. Horacio's third year assessment? Okay, I'm not really sure what plaintiffs want at this point, because their claims for relief- Well, they want money. Exactly, they want attorneys. So I'm asking you whether the, if we disagreed with you, that the assessment of Dr. Horacio was either inadequate or worse. Would the remedy be to give the plaintiff the remedy he seeks? Or would it be a remand to remedy that gap in the record? I would say that it would be a remand to go back. Is that something we have authority to do? Yes, you can remand it to the Eastern District, I believe, yes. Well, I'm not asking for the court to decide it. Would it be a remand for the state officer in the administrative process to make the appropriate assessment? I'm not sure if this court can remand the case directly back to the state review officer. I think you can remand it back to the Eastern District with instructions. With instructions? Yes, with instructions. You're just talking about the route, not the last stop. Exactly, the route. Yes, the route would be to go back to the Eastern District first, I believe. The district court could then ask the SRO to give further evaluation. Yes, but- Horacio's testimony. In my brief, in my main brief to this court, I spent a couple of pages discussing why we believe that Dr. Horacio's testimony was not credible. She had two different reports that she was testifying from. She acknowledged during her testimony that she did not understand the reading program that the district, she said I'm Googling it right now because she was speaking, she was testifying via teleconference. So she had information in front of her, I don't know what. She had two different reports that the SRO, I'm sorry, that she had before the hearing officer that were placed into evidence. And her recommendation changed each time that the parents changed their mind as to what they wanted. So first, she said that the child should be in a therapeutic environment, meaning something outside of the school district. Then she changed her testimony, said yeah, that program fusion that the parents want, that sounds good. And then later, when the parent acknowledged during the hearing that the parent wants the child in Great Neck, and that the core classes were sufficient for the child in Great Neck, then she changed her testimony and asked for more services in the district, in a specialized reading and math program. So it's our belief and it's our position, and it's been our position from the beginning that Dr. Horatio was not credible witness, and that her reports were not credible. And instead, the progress reports that the school district submitted as evidence and the testimony from the teachers that the district court relied upon. Judge Fierstein quoted the special education teacher who spent three years or maybe four years with this child, at least two periods a day. She was his specialized reading instructor. She was in the study skills class, which was an individualized, every other day, 40 minute period. She was also his English teacher. So it's our belief that the testimony of the Great Neck- Reading at the third grade level. Well, he wasn't reading, again, a reading level is based on different components. So you have an independent level, and that was at a fifth grade level. He was also reading at a seventh grade level for instructional purposes. And- What does that mean? So there's three different levels. So when you pick up something independently, I don't know exactly what it would be. But your reading is determined by comprehension, fluency, so it's how fast and how accurate you read what's in front of you. And you also have to be able to understand it, so there's different reading levels. So to say that he was reading at a second grade or a third grade reading level is not a complete picture. Did Dr. Ratio supply test scores on standardized tests? She did, she did. So when you say there was a determination she was not credible, I'm just wondering what, that could mean several things. That could mean she's not telling the truth when she reports the scores, that could be one thing. It could mean the scores aren't reliable. They weren't reliable. What do you mean when, what do you think the hearing officer meant saying she's not credible? Do you mean she's not believable? That her scores were not reliable, that the manner in which she tested the child was over. All right, so when you say that scores are not reliable, is it because that testing is not a valid procedure in the educational field? It was the manner in which that she did the testing. The manner of administration didn't yield, and what was the deficiency? The child came from Great Neck, came into the city, he was tested over the course of a day, six hours of testing, this is a child that has significant deficits and needs support. He was put into a testing situation that he didn't have any support in that testing room. And that's why some of the scores were not. And who was it, which of either officer made the determination of unreliability for that reason? I don't know that either one of them said that. What the court said, though, what George Fierstein said, was that she relied on the testimony of the school district personnel. That the child was making progress over Dr. Horatio's testing. I'm aware of that, but I'm interested in your view that somewhere in the record is a determination that those tests were unreliably administered. Who said that? I don't know that, either the SRO or- That's what you just told me. Use the word unreliable. I think- You said they were unreliably administered because he came in from Great Neck and wasn't given the normal ancillary- That was my argument, and I cited, and it's in the brief, I cited under the credibility section that we have, in the brief, or that I have in the brief, I cited the testimony of Dr. Horatio in everything, to support my argument that the testing was not done in a reliable manner, or so as to elicit reliable results. You're saying she provided the details of how the test was administered- Correct, during our testimony. And you're arguing, as a lawyer, that those circumstances are some indicia of unreliability. Correct. I see, okay. Thank you. Thank you. Thank you. I guess my time is up, right? Yes. Counsel, you have, I think, two minutes for rebuttal. Do you want to try and rehabilitate Dr. Horatio? I would just say to the panel that the only findings of credibility, in terms of the parents' witnesses, were from the IHO, and the IHO made adverse credibility determinations and assessments against some of the district personnel, saying that they were contrived and rehearsed. That's what the IHO found, and in this kind of situation, where the IHO is the trial court and hears the testimony, and sees the people, and sees the demeanor, and is able to assess that, this court and the district court should have paid deference to the IHO's assessments of credibility, but failed to do that. How the Judge Forestine, or the SRO in Albany, or in Islip, were going to determine credibility remotely- Her claim is reliability of the testing itself, not that the witness is fabricated. As far as I know, Judge, neither the SRO nor Judge Forestine made any such finding. And in fact, the IHO found Judge, Judge- Right, she acknowledged- Horatio's, yeah. Right. But I wanted to address something that you said, Judge Newman, which is that the parents want money. You have to remember, Judge, that this is a public school student who has made his way completely through the public school system. And the majority of the relief that was awarded by the IHO is non-financial relief. It is compensatory education services. It's remedial math. It's remedial reading. This is not, I mean, obviously it costs the school district money to provide that service, but they do as part of their overarching budget. But it's not like what the parents are saying, give me money. Give me a pot of money. You understand. I was just trying to understand whether the remedy would be all of the demands. Sensitory money and remedial steps versus a remand to remedy the defects and the arguable defects in the record. There is a relatively small financial component, which is the cost of doctoral ratios, evaluation, and there's one other aspect. Wasn't she, weren't they awarded the cost of that? Yes, I think it was $4,500, Judge. Now, going back to NGREF for a second, one thing I didn't say because I ran out of time was that there was a remand in NGREF. And in NGREF, there was less identity and less similarity of goals and objectives being repeated than we have in this case. There's less identity. And when the district court judge got back the case on remand, the district court reversed himself and said that because there's a pattern of unambitious goals and objectives, the student is going to get tuition reimbursement at a private school. Now, we're not seeking tuition reimbursement at a private school. As I mentioned, it's mostly comp ed for reading and math. But our situation is more compelling, and I want to go back to something that Judge Cote mentioned about our chart, which I apologize for because our chart does not have in it the goals and objectives as being perhaps too hard for the student. And the goals and objectives that they, I'm going to call it, dumbed down to make it easier to achieve. It's hard to put that into a chart. We didn't make it into our chart. So I apologize to the court that our chart did not have those aspects of it. And to that extent, it is, quote, inaccurate to that extent. But we made every effort to try to assist the court because we saw the court and the clerks, like we could not ask you, the panel, to go back and actually start comparing goals and objectives from different IEPs. It would take a long time, it took us a long time to make the chart. We were just trying to assist the court. We were not trying to create an inaccurate chart, so I apologize. What are the non-compensatory remedies you see? There's a Lindemood-Bell, the parent sent the child to Lindemood-Bell. It's a remedial reading situation. For how long? I don't have the exact . . . You mean that they've already sent the child to? Yeah. That's compensatory, right? No, it's really . . . No, it's not, Judge. It's not. What is it then? It's more of a reimbursement relief for the cost of the Lindemood-Bell program. And that is . . . Well, that sounds like money. It is money, but it is a . . . what I'm saying is it's the tip of the tail of the . . . It's not money in their pocket. It's the small aspect of the relief being sought is my point, is that most of the relief that's being requested is not financial relief. It is services relief, so this kid can start to read and he can make change and do . . . I don't understand. Isn't RCL out of the school district now? I'm sorry? Isn't he out of the school district now? Yes, but as you were on the LO case, Judge, I know that in that case it says that you can even get remedial compensatory education services after age 21. It's available after. So the fact of a student graduating is no bar. But in this case, I'm still not clear, are you saying the remedy is reimbursement for services already rendered or is it an order requiring new services? A little of both. It's both. The 750 hours of math could be . . . and the 750 hours of reading could be delivered by the school district saying, we have personnel that will teach you reading. We have tutors that will provide this to you. Or the school district would say, we want to wash our hands of you. It costs $100 an hour or whatever to do this. Just tell us . . . here's the amount of money that will cover the 750 hours. They could do that if they wished, but they could also provide it in terms of services. Many compensatory education services are done just that, in services. It's not somebody turning over money. The money turnover on this case would be the cost of doctoral ratios evaluation and the . . . I don't have the figure in front of me, but it's always real money. It's not just walking around money, but it's not $100,000 or anything like that. We see this case . . . this court already held that its decision making is not inconsistent with NJREF. NJREF is probably, of all the cases, the closest matchup to what we have in this case in terms of the identity of goals and objectives are being repeated over and over. You're not controlled by the remand whatsoever in NJREF because it was at the district court level, but it is instructive in terms of what should happen in this case. This case, we asked that the court either reinstate the IHO's award in favor of the student, so that he can now benefit from the 750 hours of math and reading and so forth, or if you feel, as we also do, that Judge Forestine didn't really grapple and wrestle with the ambitious and the challenging requirements and the overarching issue of whether this was a reasonably calculated IEP and so forth, then remand it back to Judge Forestine.  .